SCHOOL COMMITTEE OF BROOKLINE *VS.* BUREAU OF SPECIAL
EDUCATION APPEALS & others.[1]

Norfolk. March 10, 1983. — July 14, 1983.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & O'CONNOR, JJ.

*School and School Committee,* Special education. *Practice, Civil,* Special education appeal, Amendment of complaint. *Administrative Law,* Judicial review.

In an action by a town's school committee for judicial review of a decision of the Bureau of Special Education Appeals ordering it to pay private school tuition of a special needs student, the judge properly denied the school committee's motion to amend its complaint to add an allegation that, due to provisions of St. 1980, c. 580, § 7 (Proposition 2½), it was financially unable to pay the tuition. [714-715]
Considered either by the "substantial evidence" standard of G. L. c. 30A, § 1 (6), or the "preponderance of the evidence" standard contained in 20 U.S.C. § 1415 (e) (2) (1976), the record of a proceeding by the Bureau of Special Education Appeals adequately supported the Bureau's order that a town's school committee pay the tuition of a special needs student at a private day school. [715-718]

CIVIL ACTION commenced in the Superior Court Department on August 21, 1981.

The case was heard by *Dimond, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Cathleen Cavell* for the plaintiff.

*Maria I. Lopez,* Assistant Attorney General, for Bureau of Special Education Appeals.

*Herbert D. Friedman* for the parents.

[1] The other defendants are Alfred D. Ellis, a hearing officer in the bureau, and Dorothy and Donald B., the parents and guardians of Daniel B., a student.

ABRAMS, J. The school committee of the town of Brookline appeals from a judgment of the Superior Court affirming the decision of the Bureau of Special Education Appeals (bureau).[2] The bureau ordered the school committee to pay for the tuition of a special needs student, Daniel B., at a private day school from October 1, 1980, through June, 1981. See 603 Code Mass. Regs. § 332.2 (1979).

The school committee appeals claiming that the judge erred in denying its motions to amend its complaint by adding a defense of financial inability to pay, based on St. 1980, c. 580, § 7 (Proposition 2½), and by adding a claim based on 20 U.S.C. § 1415(e)(2) (1976). Additionally, the school committee argues that the bureau's decision is not supported by substantial evidence. We transferred the case to this court on our own motion. We affirm.

We summarize the facts. Daniel B., the son of the defendants Dorothy and Donald B. (parents), was six years old at the time of the proceedings before the bureau, and has special needs which qualify him for a publicly funded educational plan for special needs students. See G. L. c. 71B, inserted by St. 1972, c. 766, § 11 ("An Act further regulating programs for children requiring special education and providing reimbursement therefor"). An educational plan is designed by the school district to meet the student's special needs. The individual educational plan, among other things, must contain a statement of the general and specific educational objectives designed for the student, and the types and amounts of services necessary to enable the student to meet these objectives. G. L. c. 71B, § 3. 20 U.S.C. §§ 1401, 1414 (1976). The individual plan must state the length of a student's school day and whether provision of a special education program outside the regular public school is necessary. 603 Code Mass. Regs. §§ 322.0-325.2 (1981). In May, 1980, while the parents were Boston

_____

[2] The Bureau of Special Education Appeals is a bureau within the Division of Special Education of the Massachusetts Department of Education. See G. L. c. 15, § 1N; *Amherst-Pelham Regional School Comm.* v. *Department of Educ.*, 376 Mass. 480, 481 n.1 (1978).

389 Mass. 705 707

School Committee of Brookline *v.* Bureau of Special Education Appeals.

residents, the Boston public schools developed an individualized educational plan for Daniel for the upcoming 1980-1981 school year. That plan provided Daniel with a full school day in a private school placement.

On June 6, 1980, Dorothy B., anticipating a family move to Brookline on or about October 1, 1980,[3] met with the chairperson of the evaluation team for the Brookline public schools. Initiated by Dorothy B., the meeting's purpose was to share the assessments and individualized educational plan Boston had developed for Daniel's 1980-1981 school year.[4] Daniel's parents also wanted to discuss whether the school committee would implement Boston's educational plan and private placement decision when the family resided in Brookline, or whether the school committee would offer any comparable alternative programs to implement Daniel's educational plan.

At this meeting, the chairperson indicated that while it was most likely that the school committee would accept Boston's educational plan, it would not necessarily accept the recommended private school program placement. The chairperson suggested that two Brookline preschool, part-day, public school programs might be appropriate alternative placements for Daniel. After this meeting, Dorothy B. made two visits, one alone, and one accompanied by Daniel, to each of these two programs.

On July 25, 1980, Daniel's mother wrote to the chairperson that she found neither program appropriate for Daniel. She also stated that she had accepted the placement in Boston's educational plan. She requested a decision from the

---

[3] At the hearing before the bureau, Daniel's mother testified that she was familiar with the requirements of c. 766 because she had been a public school teacher in Boston for seven years, as well as having had previous teaching experience in Medford. She had been a principal in a Boston school for two years and also had taught at the University of Massachusetts, Boston.

[4] The chairperson has over-all responsibility for all educational plans written for Brookline's special needs students. However, the chairperson may not become actively involved in developing a particular student's plan.

school committee by August 15, 1980, on the program they were prepared to offer Daniel, so that she could consider it before the school year began.

On August 7, 1980, the chairperson responded, suggesting that there were programs in grade one that might possibly meet Daniel's needs, and that the school committee wanted to do a full reevaluation of Daniel's functioning in order to write an individualized educational plan. The chairperson recognized it was possible that new testing would not be required because Daniel had been tested within the previous six months, and those tests probably could be utilized. See, e.g., 603 Code Mass. Regs. § 306.1 (g) (1979), and § 319.5 (1981). The chairperson, however, requested that Dorothy B. sign a permission form by August 25, 1980, consenting to a full reevaluation.

In response to this letter, Dorothy B. indicated that she had received the permission form but was reluctant to authorize a full reevaluation at this time because Daniel recently had been fully evaluated.[5] She also expressed interest in exploring any of the Brookline public school first grade placements the chairperson proposed. She requested that the chairperson arrange visits to these programs for her before September 4, 1980, when Daniel would begin his private placement pursuant to Boston's educational plan. No visits were arranged.

Instead, the chairperson responded by asking for permission to conduct a full reevaluation of Daniel, administered by Dr. Melvin Levine of the school function program at Children's Hospital Medical Center. Dorothy B. responded on September 15, 1980, reiterating the reasons for her hesitation to agree to further testing for Daniel.[6] In the letter,

---

[5] By August, 1980, Daniel had been evaluated in some manner by the Harvard Community Health Plan, New England Medical Center, the neuropsychology department of Children's Hospital, and a multidisciplinary evaluation team from the Boston public schools, including preschool teachers who had worked with him for two years.

[6] The mother stated that Daniel had been extensively evaluated within the last six months, and that these test results indicated that the process of

the parents enclosed the results of testing and interviews at Children's Hospital neuropsychology department in July, 1980. The parents also suggested that the chairperson make appointments for Daniel's mother to visit any placements the school committee considered appropriate for Daniel, including those which had already been visited, and that a meeting to plan Daniel's program be scheduled for the week of September 22, 1980. Finally, the letter stated, "If you feel strongly that you need information from the School Function Program at Children's *in areas in which Daniel has not already been tested,* please let me [the mother] know specifically what you require. If such information will aid the placement process, of course I will agree to obtain it and then will add this step to the above process" (emphasis in original letter).

The chairperson replied on September 22, 1980, stating that the school committee would not pay for a private day school program without confirmation that the town's public schools could not offer the specialized program. Then, the chairperson requested that the parents agree "to allow our consultant [Dr. Levine] to review Daniel's records and make a recommendation to us as to the need for additional testing in particular areas." Shortly after receiving this letter Daniel's mother signed a consent form authorizing the school committee to release Daniel's records to Dr. Levine at Children's Hospital.

In the interim, between this exchange of writings, Dorothy B. wrote to the chairperson on September 23, 1980, stating that the family was moving to Brookline on September 30, 1980,[7] and that on October 1, 1980, "my son

---

testing "places stress on Daniel." Further, she said that testing is time consuming, and that since Daniel had already spent two weeks at the Little People's School, and had begun to adjust to his placement there, the parents were "most anxious to settle the issue of his placement."

[7] Dorothy and Donald B. signed the purchase and sale agreement for their house in Brookline on June 18, 1980, and completed the purchase on July 22, 1980. They were unable to occupy their house until after September 30, 1980, when the prior owner vacated the house and renovations were completed.

Daniel's assignment and transportation to Little People's School will become the responsibility of the Brookline Public Schools." Transportation was provided as of October 1, 1980, but Dorothy B. had no response from the chairperson concerning Daniel's tuition, and she assumed at that time that the school committee was paying it.

On October 15, 1980, the chairperson sent Dr. Levine, "correspondence and records that were made available to us about Daniel." Some time after October 15, 1980, a secretary in the chairperson's office contacted Dr. Levine's office and was informed that they had not received Daniel's records. On December 17, 1980, the school committee then sent material on Daniel to Dr. Levine.

On December 31, 1980, Dr. Levine responded. He informed the chairperson that he was "very impressed by the educational plan." However, he "was unable to compile in [his] mind a profile of [Daniel's] strengths and weaknesses . . . [and] could see no record of any complete neurodevelopmental or even standard neurological examination." Although Dr. Levine referred specifically to the reports from other medical facilities, he made no reference to the report from Children's Hospital, with which he is affiliated. These reports were not forwarded to Dr. Levine until December 17, although the school committee had possession of them since October.

In mid-January, 1981, the director of the Little People's School informed the parents that the school committee had refused to pay Daniel's tuition from October 1, 1980, and, by letter dated January 12, 1981, Dorothy B. asked the school committee for an explanation. On January 23 and 27, 1981, the chairperson responded by again requesting that the parents consent to reevaluation of Daniel.[8] On February 5, 1981, Dorothy B. replied that she wanted to cooperate with the school committee, but reiterated her re-

---

[8] Sometime between January 15 and January 27, 1981, Dorothy B. called the chairperson inquiring about Dr. Levine's report on Daniel's assessment needs. At Dorothy B's request, she was read the report, and a copy was mailed to her.

quest that the school committee explain why it had not paid Daniel's tuition, as she believed it was compelled to do under controlling regulation 603 Code Mass. Regs. 332.2 (1979).[9]

In a February 17, 1981, letter, the chairperson again requested permission to reevaluate Daniel and stated, "At this time, I cannot answer the specific questions that you have asked in this letter," until after consultation with town counsel. In another written response, Daniel's mother expressed her dismay that in spite of its failure to offer Daniel an appropriate alternative program, the school committee, nevertheless, refused to pay Daniel's tuition or to explain the refusal. She informed the school committee that she was deferring her consent for Daniel's reevaluation until its failure to pay Daniel's tuition at Little People's School was explained.

Finally, the chairperson wrote Dorothy B. on March 18, 1981, that the school committee considered Daniel "to have been placed in a private school at private expense," because of his parents' refusal to give written consent for a reevaluation. Following this letter, the parents' attorney wrote to the town counsel, requesting payment of Daniel's tuition pursuant to 603 Code Mass. Regs. § 332.2, and stating that if an affirmative response was not received by April 1, 1981, the parents would file a motion with the bureau for compliance.

On April 1, 1981, the parents' attorney telephoned the town counsel, stating that he believed the parents already had consented, or would consent, to a full reevaluation. On April 3, 1981, pursuant to 603 Code Mass. Regs. 210.0 (1979),[10] the school committee notified the division of special

[9] Regulation 332.2 states: "The IEP [individualized educational plan, see 603 Code Mass. Regs. 107.0 (1979)], written for the child by the school committee of the former community of residence and accepted by the parent remains in effect until, with the consent of the parent, the school committee of the new community of residence initiates a new evaluation and a new IEP is written and accepted by the parent."

[10] Regulation 210.0 states that where the regulations require parental participation, and the parent "fails or refuses" to cooperate, the "school

education that the parents had failed or refused to grant permission for a full reevaluation. On April 6, 1981, Dorothy B. wrote to the chairperson and returned signed consent forms for a reevaluation, and on April 22, 1981, filed a motion with the bureau for compliance with Regulation 332.0 et seq. The motion requested that the school committee be ordered to pay Daniel's tuition from October 1, 1980, until such time as the school committee wrote a new individualized educational plan, which the parents accepted.

The hearing was held before the bureau on June 2, 1981. At that time the school committee had not yet developed an individualized educational plan for Daniel's 1980-1981 school year. The hearing officer found that, pursuant to 603 Code Mass. Regs. § 332.2 (1981), Brookline was responsible for Daniel's tuition at Little People's School from October 1, 1980, through the close of the school year in June, 1981.

The hearing officer stated that "Brookline would like an exception to be drafted to the Regulation excusing responsibility if the parent does not cooperate with the evaluation process. The facts of the instant case will not support such a proposition." He found that the parents initiated contact with the school committee, and that the school committee had modified its original request for a full reevaluation, asking rather that the parents agree to a lesser review by Dr. Levine, which they did. He determined that the delay from October 15 to December 31, 1980, in obtaining such a review, was not attributable to the parents. He also determined that Dr. Levine's comment that no neurological examination was completed revealed that "Brookline apparently failed to send to Dr. Levine a complete set of Daniel's records." The records demonstrate that Daniel was seen in the neurology clinic of Children's Hospital in July, 1980,

committee shall make and document efforts to contact the parent . . . . If these efforts are attempted, documented, and found to be without success, the Administrator of Special Education within ten days after such action, shall notify the . . . Division."

and that Dorothy B. made the results of these evaluations available to the school committee.

The hearing officer found that the school committee then made another request for permission to reevaluate Daniel in late January, 1981, and that his mother's hesitation and delay in granting such permission until April 6, 1981, when the school committee explained its refusal to pay Daniel's tuition, "was regrettable." However, he did not find that "such a delay amounts to a failure to cooperate with the evaluation process such as to excuse Brookline from performing under a validly accepted I.E.P." He based the finding on his belief that "Daniel's family was acting in good faith in the evaluation process in that they believed that Daniel had already undergone considerable testing and further that the only testing Dr. Levine apparently needed was a neurological examination which had already been done by Children's Hospital in July, 1980." On July 17, 1981, the hearing officer ordered the school committee to pay Daniel's tuition for the 1980-1981 school year.

The school committee filed an action in Superior Court in August, 1981, appealing the bureau's decision pursuant to G. L. c. 30A, § 14. The parents filed a motion to compel the school committee to pay tuition in conformity with the bureau's order. The school committee requested a stay of enforcement of the bureau's decision pending the outcome of their appeal. Among the reasons the school committee advanced in support of its motion was lack of funds due to budgetary restrictions caused by St. 1980, c. 580, § 7 (Proposition 2½). Both motions were heard on December 8, 1981, and, without ruling on them, the judge ordered the case to trial on January 18, 1982.

On January 11, 1982, the bureau brought a motion to limit the issues for trial solely to those raised at the hearing, thus seeking to exclude the budgetary issue. On January 12, 1982, the parents brought a motion seeking leave to present additional evidence on the issue of Brookline's ability to pay Daniel's tuition, if the school committee were allowed to present evidence on its financial ability. On the day of

trial, the school committee filed a motion to amend its complaint seeking to include a claim under the Education for All Handicapped Children Act, 20 U.S.C. § 1415 (e)(2) (1976), and a claim alleging that lack of funds and budgetary restrictions caused by Proposition 2½ vitiated the requirements of c. 766.

The trial judge denied the school committee's motion to amend its complaint on the grounds that it was untimely and that Proposition 2½ was irrelevant to a review of the bureau's decision pursuant to G. L. c. 30A, § 14. The judge determined that the bureau's findings were supported by substantial evidence and were otherwise valid and lawful. See G. L. c. 30A, § 14. He affirmed the bureau's decision and entered judgment ordering the school committee to pay Daniel's tuition at Little People's School for the 1980-1981 school year.[11] The school committee appealed.

1. *The motion to amend by adding a claim of financial inability to pay.* The school committee claims Proposition 2½ precludes the bureau from ordering it to comply with c. 766. Thus, the school committee asserts that it was error for the judge to deny its motion, claiming that it is excused from payments for c. 766 students by virtue of the new budgetary restrictions. The short answer is that Proposition 2½ does not relieve a city or town from its educational responsibilities pursuant to c. 766.[12]

"[A] motion to amend should be allowed unless some good reason appears for denying it." *Castellucci* v. *United States Fidelity & Guar. Co.,* 372 Mass. 288, 289 (1977). See Mass. R. Civ. P. 15, 365 Mass. 761 (1974). Reasons which might justify denying a motion to amend are "undue delay, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of [the] amendment." *Foman* v. *Davis,* 371 U.S. 178, 182 (1962). See

---

[11] Daniel's tuition from October 1, 1980, through the end of June, 1981, was $4,860.

[12] The school committee could have come forward with an educational plan to meet Daniel's special needs within its public school system, but it did not do so. It therefore must pay for the plan which was provided for him.

*Castellucci* v. *United States Fidelity & Guar. Co., supra* at 289-290. Since we do not read Proposition 2½ as excusing noncompliance with c. 766, the judge did not abuse his discretion in denying the motion to amend to assert a defense of lack of financial ability.

2. *The standard of review.* The school committee sought to invoke the judicial review provisions of 20 U.S.C. § 1415 (e)(2) (1976). Under § 1415(a), "[a]ny state educational agency, any local educational agency . . . which receives assistance under this subchapter shall establish and maintain procedures in accordance with subsection (b) through subsection (e) of this section." Had the judge allowed the school committee's motion to amend its complaint to invoke 20 U.S.C. § 1415(e)(2), the bureau's decision would have been reviewed on the "preponderance of the evidence" standard, rather than the "substantial evidence" test required by Massachusetts law. See St. 1972, c. 766, § 11; G. L. c. 30A, § 14. The school committee claims that the preponderance of the evidence standard is more rigorous than the substantial evidence standard. The school committee asserts that the change in the standard of judicial review would not have delayed the trial, since it had no further evidence to submit. In this case, we need not decide whether the Federal or the Massachusetts standard is applicable, or which is more rigorous, because under either standard the judgment is correct and should be affirmed.

The Federal standard contemplates a "de novo review role by the . . . courts, including . . . an independent decision by the . . . [court] based on the preponderance of the evidence." *Kruelle* v. *New Castle County School Dist.*, 642 F.2d 687, 692 (3d Cir. 1981). See *Tokarcik* v. *Forest Hills School Dist.*, 665 F.2d 443, 448, 449 (3d Cir. 1981), cert. denied, 458 U.S. 1121 (1982). The requirement that the court "'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Board of Educ. of the Hendrick Hudson Central School Dist.* v. *Rowley*, 458 U.S. 176, 206 (1982), quoting 20 U.S.C. § 1415(e). Us-

ing a preponderance of the evidence standard, the judge must affirm the bureau's decision unless the judge determines that the school committee's evidence of the parents' failure to cooperate is more probably true than not. See, e.g., *Porter* v. *American Export Lines, Inc.*, 387 F.2d 409, 411 & n.5 (3d Cir. 1968). The Massachusetts standard on preponderance of the evidence is similar. See *King's Case*, 352 Mass. 488, 492 (1967); *Sargent* v. *Massachusetts Accident Co.*, 307 Mass. 246, 259 (1940); P.J. Liacos, Massachusetts Evidence 38 (5th ed. 1981).

The Massachusetts standard of substantial evidence is "such evidence as a reasonable mind might accept as adequate to support [the bureau's] conclusion." G. L. c. 30A, § 1(6). *Cohen* v. *Board of Registration in Pharmacy*, 350 Mass. 246, 251 (1966). The court "must defer to [the] agency's fact-finding role, including its right to draw reasonable inferences from the facts found." *Smith College* v. *Massachusetts Comm'n Against Discrimination*, 376 Mass. 221, 224 (1978). Finally, in evaluating the substantiality of the evidence before the bureau and the inferences the hearing officer drew from the evidence, we must consider anything in the record that "fairly detracts from [the] weight of the evidence supporting" the hearing officer's determination. *Cohen* v. *Board of Registration in Pharmacy, supra* at 253.[13]

The record establishes that Daniel's family moved to Brookline on October 1, 1980. As of that date, pursuant to 603 Code Mass. Regs. § 332.3 (1981), the school committee was financially responsible for Daniel's educational program. Brookline, as the new community of residence, had to pay for Daniel's placement at the Little People's School according to Boston's educational plan until such time as Brookline provided Daniel with an alternative, comparable

---

[13] Since the record before us is the same as that before the trial judge, his findings, although considered, are not accorded any special weight. *Southern Worcester County Regional Vocational School Dist.* v. *Labor Relations Comm'n*, 377 Mass. 897, 903 (1979).

individualized educational plan which was acceptable to the parents. 603 Code Mass. Regs. §§ 332.1, 332.2 (1981).[14]

Contrary to the school committee's assertion that the parents unreasonably refused to consent to a reevaluation, and that their refusal vitiates the school committee's financial responsibility for Daniel's tuition, our review of the record convinces us that the bureau's conclusion that the parents were cooperative and responsive is supported by a preponderance of the evidence. The parents initiated contact with the school committee and responded to every communication from the Brookline public schools. As a result of their hesitation to agree to further extensive reevaluation of Daniel, see note 6, *supra* (testing placed stress on the child), the school committee suggested a modification of the evaluation requirement. The parents immediately consented to this modification and authorized the school committee to release Daniel's records to Dr. Levine for review. The documents were not forwarded to the school committee's expert from October 15, 1980, to December 17, 1980. That the parents were reluctant to consent to a full evaluation at a time when the school year was more than half over is understandable. Even then they did not refuse a full evaluation, they merely sought an explanation from the school committee as to its reasons for not meeting Daniel's educational needs with a plan. The delay was based on Brookline's refusal to pay Daniel's tuition, and the failure of the school committee to offer an educational plan to meet Daniel's needs.

As of June 2, 1981, the school committee had not used Daniel's prior evaluations to formulate a new educational plan, nor had it availed itself of any alternatives such as a diagnostic educational plan, see 603 Code Mass. Regs. 502.9 (1979), in order to fulfil its obligations to Daniel. As we read the record, the school committee failed to prove a lack

---

[14] In this case, the school committee did not offer any educational plan for Daniel. Thus, we are not faced with a claim that the parents unreasonably refused to accept an appropriate educational plan.

of cooperation by the parents by a preponderance of the evidence, and there is substantial evidence to support the conclusion that the parents were reasonable and cooperated with the school committee. Further, the parents proved by a preponderance of the evidence, and presented substantial evidence, that the school committee failed to meet its educational responsibilities to Daniel.

*Judgment affirmed.*