PAUL D. DUGGAN vs. BOARD OF REGISTRATION IN NURSING.

Suffolk. January 5, 2010. - May 7, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, & GANTS, JJ.

*Board of Registration in Nursing. Nurse. License. Administrative Law,* Substantial evidence, Judicial review.

Statement of the standard applied by this court when reviewing, under G. L. c. 112, § 64, a decision by the board of registration in nursing resulting in the revocation of an individual's license to practice as a registered nurse in the Commonwealth. [673-674]

Substantial evidence supported the findings of the board of registration in nursing (board) that a nurse, while working in a hospital's emergency department, had engaged in multiple instances of inappropriate conduct in connection with his interaction with, or treatment of, young, intoxicated female patients [674-682]; further, the board did not abuse its discretion in determining that the nurse's instances of misconduct — individually, collectively, or in totality — warranted the revocation of his license to practice as a registered nurse in the Commonwealth [682-683].

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 29, 2007.

The case was reported by *Botsford,* J.

*James F. Lamond* for the plaintiff.

*Christine Baily,* Assistant Attorney General, for the defendant.

IRELAND, J. The Board of Registration in Nursing (board), after a hearing, revoked Paul D. Duggan's license to practice as a registered nurse in the Commonwealth. G. L. c. 112, § 61. The board's discipline stemmed from allegations that, while working as a nurse in the emergency department (ED) of New England Medical Center (NEMC), in Boston, Duggan had engaged in multiple instances of inappropriate conduct in connection with his interaction with, or treatment of, young, intoxicated, female patients. Duggan sought review of the board's decision before a single justice of this court, arguing that the board's decision was not supported by substantial evidence, was

arbitrary and capricious, and failed to provide a statement of reasons for its decision. G. L. c. 112, § 64.[1] See *Gurry* v. *Board of Pub. Accountancy*, 394 Mass. 118, 129 (1985), and cases cited. The single justice affirmed the decision of the board in most respects but, as relevant here, remanded the case to the board for further consideration on the issue of what sanction to impose. Of particular concern to the single justice was her view that, as to some of the individual allegations found proved, a sanction of license revocation was not warranted.

On reconsideration, the board amended its decision, taking into account the concerns of the single justice. The board concluded that, as to one incident (this incident was not one with which the single justice expressed concern), the misconduct involved, standing alone, warranted license revocation. The board further determined that different combinations of incidences of misconduct warranted license revocation and that the totality of Duggan's misconduct, save one exception,[2] warranted license revocation. Duggan again sought review by the single justice. The single justice reserved decision on the issue of the propriety of the sanction imposed and reported the case, including the correctness of her previous order in which she affirmed the board's decision in most respects (and remanded the case with regard to the sanction),[3] to the full court. We affirm the board's decision as amended.

1. *Background.*[4] Duggan has been licensed as a registered

---

[1]General Laws c. 112, § 64, provides in relevant part:

"The supreme judicial court, upon petition of a person whose certificate, registration, license or authority has been suspended, revoked or cancelled, may enter a decree revising or reversing the decision of the board, in accordance with the standards for review provided in [G. L. c. 30A, § 14 (7)]."

[2]The board found that Duggan had violated a patient's dignity and privacy by commenting to other emergency department (ED) staff about that patient's defecation accident. We do not address the allegations pertaining to this incident because it did not form any basis in the board's decision to revoke Duggan's license.

[3]The single justice's prior order was interlocutory and not then reviewable. *Lankheim* v. *Board of Registration in Nursing*, 454 Mass. 1013, 1014-1015 (2009).

[4]The facts derive from the board's findings and the hearing record. In its decision, the board grouped the misconduct alleged in the amended order to

nurse in the Commonwealth since October, 1978. He was continuously employed as a nurse at NEMC from 1980 until his termination in July, 2000. During his employment at NEMC, he worked mostly as a nurse on the night shift in the ED, at times in the position of assistant nurse manager.[5] Duggan was well liked and highly respected by his fellow nurses, other nursing staff, doctors, and supervisors. He was regarded by his coworkers as a clinical expert and an expert in emergency nursing, and as a kind and caring nurse.

At the ED, on any given night, the staff would include three or four nurses, three physicians, one or more physician assistants, an X-ray technician, one or more nursing assistants or technicians, two unit secretaries, security guards, and a hospital-wide supervisor who would visit once each night. During the night shift, there was no "triage nurse" to intake and assign patients; rather, the nurses shared the responsibility of triaging and assigning themselves to new patients.[6] The nurses practiced "primary nursing," whereby the nurse assigned to a patient became that patient's primary nurse and had ultimate responsibility for all the nursing services rendered to the patient during the patient's stay in the ED. Usually, the nurse who conducted the initial triage would become the patient's primary nurse.

Duggan often worked from 11:15 P.M. to 9:15 A.M. In the first eight hours of his shift, he assumed clinical, or patient care, responsibilities. The last two hours of his shift usually involved administrative matters, during which he attended to paperwork that was not related to his own patients.

Following a complaint of sexual misconduct by Duggan that

---

show cause into twelve separate "allegations." The parties present their arguments using the same groupings; we do so as well. The board found that five groupings of allegations of misconduct had not been proved or did not violate any applicable nursing laws or regulations and, thus, were not subject to the imposition of discipline.

[5] Assistant nurse managers in the ED took patient assignments during the course of their work shifts in addition to performing administrative duties. With respect to the patients for whom they assumed primary responsibility, assistant nurse managers had the same nursing responsibilities as did the staff nurses to patients for whom staff nurses had primary responsibility.

[6] When triaging a patient, a nurse makes an assessment of a patient's condition, including a check of the patient's airway, breathing, and circulation. The purpose of triaging is to prioritize when, and how quickly, a patient needs to be seen by an ED physician.

was investigated and determined to be unfounded (and does not form any basis of the misconduct subject to the amended order to show cause in this case), Duggan's supervisor, Adam F. Boroughs, met with Duggan alone (on March 30, 1999), and then with Duggan and other male nurses. In these meetings, Boroughs explained that, with regard to male nurses providing "intimate care"[7] to female patients, male nurses in these circumstances should adhere to a practice of being accompanied by a chaperone. Having a chaperone present would safeguard patient safety and dignity, as well as protect male nurses from false claims of impropriety.

Boroughs's suggested practice was not communicated to the ED staff at large and was not included in the ED's written standards of practice for emergency nursing. His suggestion did not rise to the level of establishing a uniform policy or accepted standard of practice in the ED requiring a male nurse to have a chaperone present every time he provided intimate care to a female patient. There is not otherwise, in the Commonwealth, an accepted standard of practice prohibiting a nurse of one gender from providing intimate care to a patient of the opposite gender, or requiring a chaperone in such circumstances. Rather, the accepted standards of nursing practice require that a nurse of either gender, in rendering intimate care, use good judgment, protect a patient's dignity and right to privacy, and maintain patient safety and appropriate professional boundaries.

A summary of the allegations that the board found had been proved follows.

a. *Allegation two: Closing and barricading the door to a treatment or trauma room while Duggan was alone inside with a young, female, intoxicated patient.* Based on the testimony of witnesses it found credible, the board determined that, on at least three occasions between 1998 and April of 2000, Duggan was found alone in one of the ED treatment or trauma rooms with a female patient who was young and highly intoxicated, with the door to the room closed and with a cart placed against the door to impede its opening. Based on the witnesses' testimony and the inferences it drew from that testimony, the board

---

[7]The term "intimate care" encompasses tasks such as undressing a patient, placing a urinary catheter in a patient, and doing an electrocardiogram on a female patient whose chest necessarily would be exposed during the procedure.

determined that Duggan had intentionally blocked or barricaded the doors, and did not credit Duggan's denial.

b. *Allegation three: Taking young, female, intoxicated patients to the bathroom and remaining therein with them.* Based on the testimony of three witnesses it found credible, the board found that, on a number of occasions in 1999 and 2000, Duggan took young, female patients to the bathroom in a wheelchair in circumstances where it appeared that the patient was so intoxicated that she would not be able to sit on the toilet herself or hold herself upright, and Duggan remained in the bathroom with the patient for up to ten minutes.

c. *Allegation four: Taking an intoxicated female patient to the bathroom while she was strapped to a stretcher in four-point restraints.* The board credited the testimony of a witness who recounted observing Duggan in the summer of 1999 pulling a stretcher with a female patient on it in restraints out of the bathroom; Duggan's face was flushed and he had a towel around his neck.

d. *Allegation five: Being alone in darkened treatment room with young, female, intoxicated patient in restraints, attempting to insert urinary catheter.* The board found that, sometime in 1999, Duggan was alone in a treatment room with a young, female, intoxicated patient who was in four-point restraints; the lights were off and the curtains pulled; and Duggan was preparing to insert a urinary catheter into the patient at the time a nursing technician entered the room. Duggan declined her offer of assistance, but the nursing technician nonetheless stayed and helped with the catheter insertion.

e. *Allegation six: Being alone with young, female, intoxicated patient in observation room with door locked and curtain pulled.* This same nursing technician testified that, on another occasion in 1999, she had located Duggan in the ED's observation room with the door closed and locked, and a young, intoxicated, female patient on the bed. Duggan was alone with the patient, the curtains around the bed were closed, and the lights were off.

f. *Allegation nine: Incident of April 27-28, 2000.* On April 27, 2000, an extremely intoxicated female college student was brought into the ED by ambulance. Duggan assumed responsibility for the patient as her primary nurse. With a female nurse,

Duggan undressed the patient and put her in a hospital gown (johnny), and inserted a urinary catheter, all of which, the board found, complied with applicable nursing standards. The board also found, however, that thereafter (after the female nurse referenced above had left), entrance to the trauma room was blocked by a cart in front of the door, and another nurse (who entered the side door) came in, observed the patient lying with her legs spread apart and dangling off the stretcher, her johnny pulled up beyond her pubic area so that the lower half of her body was exposed, and with Duggan standing between her legs. The patient was flaccid, with closed eyes; she did not speak. Duggan "stammer[ed]" an explanation to the nurse.

In its decision as amended, the board concluded that the totality of Duggan's conduct demonstrated a "continuing pattern of intentional behavior" and violated three nursing regulations that relate to abuse or mistreatment (by improper confinement) of patients, 244 Code Mass. Regs. § 9.03(15) (2000)[8]; the need to protect patient dignity, 244 Code Mass. Regs. § 9.03(17) (2000)[9]; and the need to observe appropriate professional boundaries with patients, 244 Code Mass. Regs. § 9.03(24) (2000).[10] It further concluded that the totality of Duggan's conduct amounted to "gross misconduct" within the meaning of G. L. c. 112, § 61 (gross misconduct), and conduct that undermines public confidence in the integrity of the profession. The board determined that, based on the totality of Duggan's conduct, license revocation was warranted.

The board concluded that the conduct comprising allegations two and three (repeatedly closing and barricading the door to a treatment or trauma room while alone inside with a young, intoxicated, female patient and repeatedly taking young, intoxicated, female patients to the bathroom and remaining therein with them)

---

[8]"A nurse licensed by the [b]oard shall not abuse, neglect, mistreat, abandon, or otherwise harm a patient." 244 Code Mass. Regs. § 9.03(15) (2000). The term "[m]istreatment" includes "the improper [act] of . . . confinement." 244 Code Mass. Regs. § 9.02 (2000).

[9]"A nurse licensed by the [b]oard shall safeguard a patient's dignity and right to privacy." 244 Code Mass. Regs. § 9.03(17) (2000).

[10]"A nurse licensed by the [b]oard shall establish and observe professional boundaries with respect to any patient with whom he or she has a nurse/ patient relationship. . . ." 244 Code Mass. Regs. § 9.03(24) (2000).

amounted to gross misconduct, undermined the public confidence in the integrity of the profession, and violated 244 Code Mass. Regs. § 9.03(15), (17), and (24). The board determined that this conduct, standing on its own, warranted license revocation.

The board determined that the conduct in allegation four (taking an intoxicated female patient into a bathroom while she was strapped to a stretcher in four-point restraints) constituted gross misconduct, undermined public confidence in the integrity of the profession, and violated 244 Code Mass. Regs. § 9.03(15) (relating to confinement) and (17) (relating to patient dignity and privacy). The board concluded that this conduct provided additional support (considered with allegations two and three) for the revocation of Duggan's license.

The board turned to the conduct comprising allegation five (being alone in a darkened treatment room with a young, female, intoxicated patient in restraints, attempting to insert a urinary catheter). The board concluded that this conduct provided additional support for the fact that Duggan was engaging in a continuing pattern of intentional behavior.

The board determined that the conduct underlying allegation six (being alone with a young, female, intoxicated patient in an observation room with the door locked and curtain closed) constituted gross misconduct, undermined public confidence in the integrity of the profession, and violated 244 Code Mass. Regs. § 9.03(15), (17), and (24). The board concluded that this conduct provided additional support (considered with allegations two and three) for the revocation of Duggan's license.

The board stated that Duggan's conduct comprising allegation nine (the incident of April 27-28, 2000) amounted to gross misconduct, undermined the public confidence in the integrity of the profession, and violated 244 Code Mass. Regs. § 9.03(15), (17), and (24). The board concluded that this conduct, standing alone, warranted license revocation. Alternatively, the board indicated that this conduct provided additional support (considered with allegations two and three) for the revocation of Duggan's license.

The board made clear: "If for any unforeseen reason, the [c]ourt were, on [a]ppeal, to strike the [b]oard's findings hereinabove with respect to [a]llegations [t]wo and [t]hree standing

alone, the [b]oard also finds that [a]llegations [f]our, [s]ix, and [n]ine (and the attendant violations) coupled with the facts underlying [a]llegation [f]ive, without more, constitute a continuing pattern of intentional behavior [that it finds] that these violations *standing alone* would require the [r]evocation of [Duggan's] license" (emphasis in original). The board ordered Duggan to return his nursing license.

2. *Standard of review.* Duggan brings his appeal pursuant to G. L. c. 112, § 64, which adopts the standard of review in G. L. c. 30A, § 14 (7). Under G. L. c. 30A, § 14 (7), we may revise or revoke a decision of the board that is (1) in violation of constitutional provisions; (2) in excess of the board's authority; (3) based on an error of law; (4) unsupported by substantial evidence; or (5) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law. See *Bettencourt* v. *Board of Registration in Med.*, 408 Mass. 221, 227 (1990). We are to review "the decision of the board directly, despite [the fact that the case was brought in part] as an appeal of a decision of the single justice." *Birudavol* v. *Board of Registration in Med.*, 448 Mass. 1031, 1031 (2007), quoting *Weinberg* v. *Board of Registration in Med.*, 443 Mass. 679, 685 (2005). Because Duggan is challenging the board's decision, he bears the burden of demonstrating that it is invalid. *Fisch* v. *Board of Registration in Med.*, 437 Mass. 128, 131 (2002).

Here, Duggan claims that the board's decision is unsupported by substantial evidence, see G. L. c. 30A, § 14 (7) (*e*); the board failed "to state, in judicially reviewable fashion, the reasons for its decision" pursuant to G. L. c. 30A, § 11 (8)[11]; and the board abused its discretion in imposing the sanction of revocation, see G. L. c. 30A, § 14 (7) (*g*). With regard to whether a decision is supported by substantial evidence, our review is limited: "While we must consider the entire record, and must take into account whatever in the record detracts from the weight of the agency's opinion . . . as long as there is substantial evidence to support the findings of the agency, we will not substitute our view of the

---

[11]General Laws c. 30A, § 11 (8), provides in relevant part that "[e]very agency decision . . . shall be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision . . . ."

facts." *Kippenberger* v. *Board of Registration in Veterinary Med.*, 448 Mass. 1035, 1036 (2007), quoting *Fitzgerald* v. *Board of Registration in Veterinary Med.*, 399 Mass. 901, 906 (1987). " 'Substantial evidence' means such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). The standard is more stringent than abuse of discretion, and less than preponderance of the evidence; "an agency's conclusion will fail judicial scrutiny if 'the evidence points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary.' " *Cobble* v. *Commissioner of the Dep't of Social Servs.*, 430 Mass. 385, 390-391 (1999), quoting *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). "[I]t is for the agency, not the reviewing court, to weigh credibility of witnesses and resolve factual disputes involving contradictory testimony." *Cobble* v. *Commissioner of the Dep't of Social Servs.*, supra at 393 n.8. In addition, the reviewing court must defer to the agency's right to draw inferences from the testimony and evidence before it. *School Comm. of Brookline* v. *Bureau of Special Educ. Appeals*, 389 Mass. 705, 716 (1983).

3. *Discussion.* a. *Claims regarding the specific allegations.* i. *Allegation two.* We reject Duggan's contention that, as to allegation two (closing and barricading the door to a treatment or trauma room while Duggan was alone inside with a young, female, intoxicated patient), the board's fact conclusions and inferences were not supported by substantial evidence. He generally asserts that there was no direct evidence that he was the one to close and barricade the doors in question; that any inferences that he did so were not reasonable on account of various factors, including a lack of motive for him to do so and the existence of alternative entries into the rooms; and that overwhelming evidence, including his denial of the accusations, pointed to an inescapable opposite inference. Duggan made these same arguments to the single justice, and she rejected them. We adopt her reasoning and conclusions in their entirety and conclude that there was substantial evidence to support the board's fact conclusions and inferences.

As noted by the single justice, the board found that the usual practice in caring for intoxicated patients, designed to permit

easy observation of the patient for safety reasons, is to keep a patient's room well lit and the privacy curtains and door (the main door connected to the hallway) open. Other than the three occasions reported (and a trauma occurring in the room, which was not involved during these occasions), no witness recalled the door to the larger trauma rooms being blocked by a cart in a way that made it difficult to open the door. To the contrary, the door was usually open and unobstructed.

The board acted within its considerable discretion to credit the testimony of five witnesses — Michelle Forgues, a registered nurse (R.N.); Kendra Nolet, then a nursing technician; Catherine Howard, R.N.; Vadmay Edwards, a nursing technician; and Marian Lemieux, R.N. — that on three separate occasions, Duggan was found in trauma room 3-4 with a cart impeding or preventing access through its main door connected to the hallway. The first time was in 1998 and was seen by Nolet. The second incident occurred during the summer of 1999 and was observed by Forgues. The last event was on April 27-28, 2000, and was witnessed by Howard, Edwards, and Lemieux. In each case the patient was young, female, and intoxicated. In two cases, the curtain was drawn even though the door was closed, and in all three instances most of the lights were off or dimmed. In the two cases with the curtain drawn, witnesses believed that all patient care requiring privacy had been completed. In each case, there was testimony, which the board implicitly credited, that there was no treatment-related reason for the curtains to be drawn, the majority of lights in the room to be off or dimmed, and the door to be closed. Thus, the consistent and unusual circumstances in which Duggan was discovered permitted the board's inferences with respect to allegation two. The record does not support an "overwhelming probability" against the board's credibility determinations and ultimate conclusions.[12] See *Cobble* v. *Commissioner of the Dep't of Social Servs., supra* at 391.

ii. *Allegation three.* The board's conclusions concerning allegation three (taking young, female, intoxicated patients to the

---

[12]That the facts could be argued in Duggan's favor or different credibility determinations could have been made does not equate with an "overwhelming probability" of a conclusion to the contrary. See *Cobble* v. *Commissioner of the Dep't of Social Servs.*, 430 Mass. 385, 391 (1999), quoting *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981).

bathroom and remaining therein with them) took into account the fact that "it is possible for it to be clinically appropriate for a male nurse to take a female patient to the bathroom and to remain in the bathroom with her while she toilets, so long as doing so comports with all other applicable nursing laws and regulations." The board, however, found that Duggan's actions in this regard did not so comport with applicable nursing laws and regulations because he repeatedly brought young, female, intoxicated patients into the bathroom and remained there with them under "atypical circumstances." The atypical circumstances included, "among other things, that: (1) [Duggan] repeatedly took young, female, intoxicated patients to the bathroom who either could not stand on their own or could not sit in a wheelchair; (2) he declined offers of assistance from female staff; (3) he remained in the bathroom with these patients behind closed doors for up to [eight to ten] minutes; (4) he engaged in this practice as to young, female, intoxicated patients and not other patients; and (5) he took young, female, intoxicated patients to the bathroom even when the patients were not assigned to him."

We reject Duggan's claim that the board provided a "legally inadequate explanation" for its decision and did not provide a statement of the reasons for its decision pursuant to G. L. c. 30A, § 11 (8). The board explained that it credited the testimony of the board's expert Janet Madigan and the testimony of many of Duggan's coworkers that, when a patient is intoxicated to the point that she is unable to sit upright in a wheelchair and keep her arms and feet in the chair, it is not safe for the patient and is not good nursing judgment to take that patient to the bathroom. The better alternative, which maximizes a patient's safety and dignity and does not violate professional boundaries, is to offer a female patient a bedpan. That testimony, coupled with the atypical circumstances listed above, as well as the numerous factual findings made by the board as to specific instances of Duggan's taking young, intoxicated, female patients to the bathroom, provided an adequate explanation for its conclusions and provided a sufficient statement of the reasons for its decision pursuant to G. L. c. 30A, § 11 (8). Further, the board permissibly could conclude that Duggan's conduct amounted to gross misconduct and violated accepted standards of nursing as well as particular nursing regulations even if Duggan had a clinical

reason for his actions. Cf. *Goldstein* v. *Board of Registration of Chiropractors*, 426 Mass. 606, 609 (1998) (upholding board's finding that, "even were these procedures medically justifiable in appropriate circumstances, the manner in which [the licensee] performed them was not").

Duggan challenges the factual findings as to "atypicality" as unsupported by substantial evidence and the product of arbitrary and capricious decision-making. We reject these contentions.

In challenging the first atypical circumstance, that Duggan took patients who could not stand on their own or could not sit in a wheelchair to the bathroom, Duggan asserts that there was no evidence to support the statement that he took patients who could not stand on their own to the bathroom. He explains that the fact that he transported patients in a wheelchair cannot support an inference that those patients were unable to walk. Duggan ignores all the evidence surrounding these events. For example, when Forgues (a registered nurse) observed Duggan bring a young, intoxicated, female patient to the bathroom in a wheelchair, she observed that the patient had difficulty remaining in the wheelchair — the patient was sliding off the bottom of the wheelchair. Further, that patient, once inside the bathroom, could not even balance herself on the toilet seat. Duggan had to place his hands on her shoulders to hold her upright. In these circumstances, it was more than reasonable for the board to infer, and there was substantial evidence permitting it to infer, that this patient, without the wheelchair, would not have been able to stand on her own.

Duggan claims that there was insufficient evidence to support the finding that he took patients to the bathroom who were unable to sit in a wheelchair. The board's findings regarding the account given by Forgues, which was credited by the board, is substantial evidence to support the finding. In addition, the board credited the testimony of a security guard, Paul Vedrani, that Duggan transported a patient who was unable to sit in a wheelchair. Vedrani's testimony that the patient seemed very intoxicated, could not keep her feet on the footrest of the wheelchair, was lethargic and could not keep her eyes open, and sat in a manner that she was not cognizant of the fact that others could see that she was not wearing underwear, reasonably permitted the board to infer, and constituted substantial evidence of the fact,

that the patient was not able to sit in the wheelchair (and was not otherwise able to walk on her own). That the testimony came from a "lay" witness and not from a registered nurse pertained to the weight of the evidence, which was for the board to decide.

We add that the testimony of one other nurse that, on occasion, she too held female patients up on the toilet does not speak to the clinical judgments made by Duggan in the specific circumstances for which the board disciplined Duggan. Even if this nurse were to be confronted with the same circumstances that Duggan had faced and had exercised the same clinical judgment, the board credited Madigan and other coworkers that the better clinical judgment in such circumstances, which would not have violated nursing regulations, would have been to give the patient a bedpan.

Duggan takes issue with the board's finding of the second atypical circumstance, namely, that he declined offers of assistance from female staff. The finding was supported by substantial evidence comprising the testimony of Forgues, Edwards, and Vedrani. Duggan insists that the finding is "legally inadequate" or arbitrary because it is not atypical behavior for someone to "not slough[] off an arguably unpopular assignment onto someone else." This reasoning ignores the climate during which these incidents occurred. Boroughs had communicated to Duggan the concern over false accusations being made by female patients when male nurses provided intimate care. Duggan knew that his superior wanted the provision of his intimate care to female patients to be chaperoned, yet he declined such offers of assistance. The circumstances certainly indicated that Duggan wanted to be alone with young, female, intoxicated patients. On this record, it was not arbitrary for the board, in these circumstances, to consider Duggan's rejection of assistance to be atypical.

The testimony of Edwards and Vedrani provided substantial evidence supporting the board's determination that the fact that Duggan remained in the bathroom with the young, female, intoxicated patients behind closed doors and for up to eight to ten minutes was atypical, and the determination that it was atypical for Duggan to take only young, female, intoxicated patients to the bathroom. Again, Duggan ignores the climate during which his actions occurred and views the conduct in isolation. That Vedrani was a security guard and not a medical

professional, and did not work a shift every time that Duggan worked, were considerations for the board that went to the weight of the evidence. Those factors did not compel a contrary conclusion.

Last, there was testimony from Edwards stating that Duggan took patients to the bathroom who were not assigned to him, which provided substantial evidence for the board's last finding of atypical circumstances. Duggan claims that the determination was improper because it ignored undisputed evidence that nurses would care for patients assigned to other nurses when the primary nurse was on break or was busy with other patients. Duggan's argument again ignores the over-all climate during which his conduct occurred and the fact that the patients he took to the bathroom who were not assigned to him were only young, female, intoxicated patients. With respect to all other patients, he asked Edwards to give them a bedpan.

iii. *Allegation four.* Duggan argues that the board lacked substantial evidence to support its findings that, in June or July of 1999, he took an intoxicated, female patient to the bathroom while she was strapped to a stretcher in four-point restraints. He further asserts that the board's conclusion that this action violated nursing laws was arbitrary or capricious.

The board was faced with two conflicting accounts: the account of Vedrani, who testified in detail, and Duggan's statement that he did not recall such an incident, but speculated Vedrani may have seen him leaving a bathroom with paper towels to clean up vomit, and mistakenly believed that the stretcher had been in the bathroom. The board chose to credit Vedrani's account, and the record does not reveal a legitimate reason to overturn its decision. That Vedrani did not see Duggan initially enter the bathroom with the patient is not significant. From Vedrani's unequivocal testimony that he saw Duggan pull the stretcher out of the bathroom with the patient still in restraints, the board permissibly inferred that Duggan was the person who initially brought the patient into the bathroom. A lack of motive for Duggan's alleged actions is also irrelevant. The board was not required to prove why Duggan would undertake such an action, and it was his actions only that were found to be inappropriate and subject to discipline.

The board's expert, Madigan, testified that a patient in four-

point restraints would not be a good candidate to go into a bathroom. Madigan explained, "[Patients in restraints are] restrained for some reason, either they're agitated or they're highly medicated or they're not able to stand on their own. And it would be a safety issue if you brought them into the bathroom." Madigan gave her opinion that the conduct of a male nurse bringing a female patient in four-point restraints into a bathroom would violate professional boundaries, as well as patient dignity and privacy, which in turn are violations of the generally accepted standards of nursing practice. From this testimony, the board permissibly could conclude that Duggan's actions constituted gross misconduct, harmed the integrity of the nursing profession, and violated the cited nursing regulations. The board's conclusion was not arbitrary or capricious.

iv. *Allegation five.* The facts comprising allegation five (being alone in a darkened treatment room with a young, female, intoxicated patient in restraints, attempting to insert a urinary catheter by himself, and rebuffing an initial offer of assistance) are supported by substantial evidence, essentially the testimony of Nolet, which the board found credible. We find no error or abuse of discretion in the board's conclusion that this conduct provided additional support for the existence of Duggan's continuing pattern of intentional behavior.

v. *Allegation six.* Duggan challenges the board's conclusions as to the facts comprising allegation six (being alone with a young, female, intoxicated patient in an observation room with the door locked and the curtain pulled). Significantly, in reaching its conclusions, the board expressly inferred that Duggan intentionally closed the door to the observation room knowing it would lock. Duggan argues that this inference is not supported by substantial evidence where he had not been seen closing the door, Nolet did not know that the door was broken so that it would automatically lock when closed, and the door was made of glass through which Nolet could see him. He also essentially contends that the board committed an error of law in ruling that its findings amounted to improper conduct, in view of the facts that nurses sometimes close doors to provide quiet time for patients; the room was in a busy area; Duggan promptly responded to Nolet's knocking; Nolet had not worked at the hospital at the time long enough to know whether the door was ordinarily closed; and once the door

was opened, Nolet perceived nothing wrong with the patient's care.

The record does not support Duggan's arguments. The board's inference that Duggan closed the door knowing it would lock has sufficient inferential support in the record. Apart from the patient, Duggan was the only one in the room, and Nolet previously had not seen that door closed. No contradictory evidence suggests that the door was commonly closed; indeed, Lisa Wieliczkiewicz, a secretary in the ED testifying for Duggan, stated that once the staff knew about the broken lock, "[t]hey would try to keep [the door] open." Nolet's testimony does not relate any surprise by Duggan that the door was locked, and he testified that he knew at some point that it was broken. Moreover, Nolet testified that, when she looked in the window to the room, she observed a curtain that concealed the patient, from behind which Duggan emerged when she knocked. Thus, contrary to Duggan's assertion, Duggan was not plainly visible to Nolet. The board was within its authority to conclude that a nurse may not knowingly lock a door and seclude himself behind a curtain with an intoxicated patient of the opposite gender. Duggan's claims as to this allegation lack merit.

vi. *Allegation nine.* Duggan makes several claims regarding allegation nine (the incident of April 27-28, 2000). He first contends that the board's decision is arbitrary or capricious because it erroneously states that he did not contest that a cart was blocking the door to the trauma room in which he was found with the patient, when, in fact, he did contest that fact. A review of the record reveals that Duggan did dispute that a cart was blocking the door. The board's misstatement, however, must be examined in context. The misstatement appeared in a footnote in which the board was assessing Lemieux's credibility. Regardless of whether the cart initially had been blocking the door, it did not escape the board that Duggan denied having placed it there, and the board discredited that testimony for the reasons it explained in connection with allegation two. The inquiry that was essential to its conclusion was whether it was Duggan who blocked the door with the cart, not whether a cart initially had been blocking the door.

Duggan argues that the board's conclusion, that he did not have a permissible reason for his conduct, was unsupported by

substantial evidence. In particular, he contends that there was not substantial evidence concerning the location in which he was found in the trauma room. Contrary to his contention, the record supports the board's finding that Duggan was found standing between the patient's legs. Lemieux testified that when she pulled back the curtain, she observed the patient "laying on the stretcher facing the back wall" and "[h]er legs were spread apart." As to Duggan's location, Lemieux stated that he "was standing between the wall and the stretcher," and that he "came from around between [the patient's] legs." From this testimony, it was reasonable for the board to find that Duggan had been standing between the wall and the patient's legs and, hence, between the patient's legs, and had not been standing between the wall and some other area behind the confines of the curtain.

Duggan also maintains that Lemieux's account, for various reasons, "does not provide the necessary substantial evidence to support the [b]oard's conclusion." While we disagree, we point out that the board did not rely solely on Lemieux's account of the April 27-28, 2000, incident. In addition to Lemieux's testimony, the board credited and relied on the testimony of Edwards and Howard, as well as Madigan, all of which satisfied the requisite substantial evidence standard. Finally, we reject Duggan's contention that the record "as a whole" compelled the conclusion that he acted permissibly in the circumstances. The board acted within its discretion in discrediting Duggan's account, and otherwise had substantial evidence to support its findings and conclusions.

b. *Sanction.* Duggan argues that the board abused its discretion in revoking his license because it "explicitly linked its sanction . . . to its strong disapproval of Duggan's refusal to admit his guilt." Relying on an analogy to the sentencing of criminal defendants, Duggan maintains that the board may not consider his "profession of innocence." The record does not support Duggan's argument. In its amended decision, the board considered Duggan's "lack of acknowledgment" and "failure to accept responsibility for his actions" only in the context of possible future reinstatement of his license. We add that board disciplinary proceedings are not penal or criminal in nature, and standards from criminal proceedings are inapplicable. *Weinberg v. Board of Registration in Med.*, 443 Mass. 679, 688-689

(2005). The board imposes discipline on medical professionals not as punishment, but "to promote the public health, welfare, and safety." *Kvitka* v. *Board of Registration in Med.*, 407 Mass. 140, 143, cert. denied, 498 U.S. 823 (1990), quoting *Levy* v. *Board of Registration & Discipline in Med.*, 378 Mass. 519, 524 (1979). The board did not abuse its discretion in determining that Duggan's conduct, individually, collectively, or in totality (as stated in its amended decision), warranted the revocation of his license. *Kvitka* v. *Board of Registration in Med., supra.*

c. *Conclusion.* The case is remanded to the county court, where a judgment shall enter affirming the decision of the board, as amended, revoking Duggan's license to practice as a registered nurse in the Commonwealth.

*So ordered.*